Notice: This opinion is subject to formal revision before publication in the Federal Reporter or U.S.App.D.C. Reports. Users are requested to notify the Clerk of any formal errors in order that corrections may be made before the bound volumes go to press.

# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Argued November 17, 2009        Decided March 5, 2010

No. 08-3018

UNITED STATES OF AMERICA,
APPELLEE

v.

EDWARD EVERETT BROWN, JR.,
APPELLANT

———

Appeal from the United States District Court
for the District of Columbia
(No. 06cr00295-01)

———

*Edward C. Sussman*, appointed by the court, argued the cause and filed the brief for appellant.

*John P. Gidez*, Assistant U.S. Attorney, argued the cause for appellee. With him on the brief were *Roy W. McLeese III* and *Chrisellen R. Kolb*, Assistant U.S. Attorneys.

Before: HENDERSON, ROGERS and BROWN, *Circuit Judges*.

Opinion for the Court by *Circuit Judge* ROGERS.

ROGERS, *Circuit Judge*: Edward Brown was convicted by a jury of bank fraud, in violation of 18 U.S.C. § 1344, and passing fictitious financial instruments, in violation of 18 U.S.C. § 514, for trying to deposit two fictitious "bills of exchange" in his account at a federal credit union. He appeals on the ground the district court abused its discretion by permitting introduction of other crimes evidence that was unnecessary to the government's proof of the charged offenses and unfairly caused the jury to focus on his character and propensity to commit crime, thereby denying him a fair trial. Relying on the limits established by Federal Rules of Evidence 404(b)[1] and 403,[2]

---

[1] Rule 404(b) of the Federal Rules of Evidence provides:

> Evidence of other crimes, wrongs, or acts, is not admissible to prove the character of the person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident, provided that upon request by the accused, the prosecution in a criminal case shall provide reasonable notice in advance of trial, or during trial if the court excuses pretrial notice on good cause shown, of the general nature of any such evidence it intends to introduce at trial.

[2] Rule 403 of the Federal Rules of Evidence provides:

> Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.

Brown maintains that "much of the substantive testimony introduced by the government focused, not on [his] attempt to negotiate the instruments that were the subject of the indictment, but his attempted purchase of three cars and a $1.8 million Maryland home," Appellant's Br. 22, and "likely exceeded the time devoted to the indicted charges," *id*. at 23.

The Rule 404(b) evidence, with one exception, concerned Brown's use of fictitious financial documents before the first charged offense and shortly before the second charged offense. Although this evidence consumed a large part of the government's case-in-chief, the district court could reasonably conclude there was no unfair prejudice to Brown under Rule 403. Brown's intent was the contested issue at trial: The government had to prove he acted with specific intent to defraud the credit union, and Brown claimed to have acted in good faith. The extrinsic evidence of Brown's other uses of fictitious financial documents was substantively and temporally tied to the charged offenses, and those other uses were distinct enough not to be the "needless presentation of cumulative evidence," FED. R. EVID. 403. The extrinsic evidence that Brown had failed to pay for a house inspection, on the other hand, was not probative of his intent to defraud the credit union and therefore inadmissible under Rule 404(b); but this evidence was quite limited in length, not inflammatory, and was not mentioned during the government's closing arguments. The district court's limiting instructions guarded against the jury's reliance on impermissible inferences that might have been drawn from the Rule 404(b) evidence. Accordingly, we affirm.

## I.

Following a mistrial when the jury could not reach a verdict, Brown was found guilty by a jury at his second trial. The government presented evidence through four witnesses

regarding Brown's attempts on two occasions to deposit a fictitious "bill of exchange" in his account at the Treasury Department Federal Credit Union on July 20, 2005 and February 21, 2006. This testimony also revealed that Brown thought House Joint Resolution 192, enacted in 1933 by the 73rd Congress, had created a private direct account with the Treasury Department for all citizens of the United States once they filed a "Uniformed Code financing statement." Having obtained what he thought were genuine financial documents in the form of "bills of exchange," Brown attempted to use them to access his Treasury account. The government also introduced the two "bills of exchange" into evidence.

We summarize the testimony presented in the government's case-in-chief, separating the testimony of the Rule 404(b) witnesses in view of Brown's contentions on appeal. At trial, however, the jury heard first about Brown's attempt to deposit a "bill of exchange" at the credit union on July 20, 2005 and the subsequent warning to him by a Special Agent from the Treasury Department. The jury then heard from two Rule 404(b) witnesses about Brown's attempt to purchase a house in February 2006. Testimony about the second charged offense on February 21, 2006 followed. A Rule 404(b) witness from PNC Bank then testified about events in June 2005. He was followed by a document expert from the Treasury Department. Two Rule 404(b) witnesses then testified about Brown's attempt to purchase three cars and a subsequent warning to him by a detective assigned to the Secret Service.

**A.**

Timothy Anderson, the Chief Operating Officer and Vice President of the credit union, testified that on July 20, 2005, Brown presented for deposit in his credit union account a "bill of exchange" in the amount of $2.9 million, which was labeled "Certified U.S. Department of Treasury," with a three-digit

number, printed with the name "SunTrust Bank International Bill of Exchange," and stated it was payable through SunTrust Bank. Anderson explained that although the "bill of exchange" had some similarities to valid bills, such as check and routing numbers, the words "paid to the order of," and the name of a bank it was payable through, it also contained a number of irregularities, such as being printed on paper rather than "check stock" and in multiple colors, as well as containing the words "UNCITRAL Conventions," which "have no meaning as far as negotiating the check." In response to his inquiries, Treasury Department agents instructed Anderson to contact Brown, who subsequently provided Anderson with additional documents purporting to validate the $2.9 million "bill of exchange." One such document was labeled "Original Silver Surety Bond," which, according to Anderson, Brown "incoherent[ly]" explained "would support" the "bill of exchange." A videotape of Anderson's meeting with Brown on August 5, 2005 was played for the jury. Anderson testified he never intended to deposit the "bill of exchange" in Brown's account. Eventually, he stopped responding to Brown's telephone messages.

Patrick Blake, a Special Agent at the Treasury Department, testified that he met with Brown on August 30, 2005. He told Brown that his "bill of exchange" was worthless and that it was illegal to try to negotiate it.

Shawn Kahler, a compliance officer at the credit union, testified that he met with Brown on February 23, 2006 regarding Brown's second attempt, on February 21, 2006, to deposit a fictitious "bill of exchange," this time for $5.5 million. The bill showed a certification by the Treasury Department and was made payable to Brown. Brown gave Kahler a second deposit slip for the $5.5 million "bill of exchange" and a wire transfer request for $1.8 million to be sent to the Bank of

America. Brown did not mention his first attempt to deposit a "bill of exchange" at the credit union, although Kahler was aware of it and had responded to one of Brown's telephone messages for Anderson. A videotape of their meeting and a tape of their prior telephone conversation were played for the jury.

Alexis Rohan, a Treasury Department forensic document examiner, testified as an expert witness. He opined that each "bill of exchange" Brown had presented to the credit union was not a valid financial document. He explained the Treasury Department does not certify financial instruments for individuals, contrary to the representations in Brown's documents.

**B.**

Over defense objection, the district court also allowed the government to introduce, pursuant to Rule 404(b), testimony from five witnesses about other occasions when Brown used fictitious financial documents in attempts to obtain something of value. Brown had indicated during the course of the charged offenses that he was acting in good faith, and, in moving for admission of Rule 404(b) evidence, the government stated it anticipated that he would present a good faith defense at trial. The district court ruled the Rule 404(b) evidence was relevant to show Brown's intent, knowledge, motive, and absence of mistake or accident.

Sam Fisher, a real estate agent with Coldwell Banker, testified that in January or February of 2006 Brown gave her a $50,000 "certified check" from "Suntrust Bank" as an earnest money payment on the purchase of a $1.8 million house located in Maryland. When the check bounced, Brown told her the bank had made a mistake and gave her a silver "surety bond" for $50,000. After Fisher refused to accept the "surety bond"

and asked for another certified check, she never heard from Brown again. Fisher also testified that she had paid for a $700 home inspection fee, but Brown had never reimbursed her.

Matthew Hurd, a settlement officer for NRT Mid-Atlantic Title Services, LLC, testified that in February 2006 he contacted Brown about the Maryland real estate purchase. Brown told him that the house was being purchased by a trust, "Arcturus Telecommunications Enterprises," which would wire the needed funds. Hurd subsequently received from Brown by fax a "trust document," which stated that the trust was formed in England and identified Brown as the "lawful bearer of 100 units of beneficial interest" and the managing director. After Hurd informed Brown that the earnest-money check had bounced and refused to accept another, Brown gave Hurd a $50,000 Treasury Department "surety bond" to demonstrate that he had money, as well as wiring instructions. Hurd faxed the wiring instructions to the credit union and was subsequently informed by a U.S. Secret Service agent that Brown did not have any funds on deposit at the credit union.

Joel Gold, in-house counsel at PNC Bank, testified that in June 2005 Brown had given him for deposit a "bill of exchange" in the amount of $2.9 million payable to "Arcturus Telecommunications Enterprise." Gold wrote Brown several letters advising that the bank would not honor the demand of payment because the "bill of exchange" had no legal or monetary value and that Brown should stop using them.

Rita Nyambi, a manager at CarMax in Maryland, testified that in August 2004 Brown attempted to buy three cars with "registered" drafts in the amounts of $23,000; $25,000; and $40,000; which exceeded the total purchase price. The salesperson on the lot accepted the drafts in payment and Brown took possession of the cars. After the drafts proved non-

negotiable, Brown told Nyambi she had not followed the instructions and insisted she resubmit the drafts to the bank. When the drafts bounced, CarMax repossessed the cars and contacted law enforcement.

Pete Medley, a detective assigned to the U.S. Secret Service Federal Financial Crimes Task Force, testified that in September 2004, after the CarMax incident, he had warned Brown that his financial documents were bogus and that it was unlawful to use them.

The district court gave limiting instructions to the jury on the proper use of the Rule 404(b) testimony after the real estate agent's direct testimony, after the PNC Bank testimony, and after the CarMax testimony.[3] Additionally, it instructed the jury

---

[3] After Fisher's direct examination the district court instructed the jury regarding the evidence about Brown's attempt to purchase the house:

> Because [Fisher's testimony is] evidence of other types of activity and it's allowed in [evidence] only to help you decide whether the government has proved beyond a reasonable doubt that the defendant had specific intent set forth in the elements of the counts I've read to you earlier to commit the crimes alleged. * * * It doesn't come in to show that he's a bad person. * * * It's [to be] considered only for [the] limited purpose [of] whether or not the defendant . . . did so with specific intent to commit these crimes as relevant [to the] crimes before you, and he didn't do it accidentally or by mistake. He acted knowingly with a motive to do so.

July 31, 2007 Trial Tr. 154–56. Similar instructions were given after the PNC and CarMax testimony.

on the Rule 404(b) evidence before it retired to deliberate.[4] The government introduced into evidence the fictitious financial documents Brown had used in the real estate, PNC bank, and CarMax transactions.

## C.

Brown testified in his defense. He explained his understanding that House Joint Resolution 192 created Treasury accounts that citizens could access upon filing documents like the "bills of exchange" he had tried to deposit at the credit union. Brown told the jury he believed that the "bills of exchange" had value once the Treasury account was accessed correctly and that depositing "bills of exchange" at the credit union, which he thought was part of the Treasury, could access this account. He also believed the silver "surety bonds" were

---

[4] The district court instructed the jury:

You have heard evidence about other alleged acts of the defendant with which he is not charged in the indictment. . . . It is up to you to decide whether to accept that evidence. If you consider the evidence of the defendant's other acts, you may use it only to help you decide whether the government has proved beyond a reasonable doubt that the defendant had the intent to defraud, or acted knowingly and on purpose and not by mistake or accident. * * * You may not consider this evidence for any other purpose. The defendant has not [been] charged with any offense related to the other acts. You may not consider this evidence to conclude that the defendant has a bad character, or that the defendant has a criminal personality. The law does not allow you to convict a defendant simply because you believe he may have done bad things not specifically charged as crimes in this case.

August 2, 2007 Trial Tr. 53–54; *see* Instruction No. 2.51 of the Criminal Jury Instructions for the District of Columbia (4th ed. 2007).

valid based on the "Coinage Act" but was unable to identify the exact date that statute was passed.  Finally, Brown emphasized that he never intended to defraud anyone.

The jury found Brown guilty, and the district court sentenced him to six months' imprisonment followed by three years' supervised release.  The district court denied Brown's motion for a new trial.  *United States v. Brown*, 535 F. Supp. 2d 80 (D.D.C. 2008).

## II.

Brown's challenge to his conviction focuses on two rules of evidence.  Each addresses Brown's concern, acknowledged by this court in *United States v. Mitchell*, 49 F.3d 769, 777 (D.C. Cir. 1995), that when other acts evidence is introduced to show intent, there is an inherent risk the jury will misuse the evidence because such evidence necessarily involves an inference of bad character and little separates the inference from the defendant's prior conduct and the general propensity inference that must be prevented.

## A.

Rule 404(b) provides that "[e]vidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith." FED. R. EVID. 404(b).  Although it is axiomatic that "a defendant must be tried for what he did, not for who he is," *United States v. Linares*, 367 F.3d 941, 945 (D.C. Cir. 2004), in some cases "[e]xtrinsic acts evidence may be critical . . ., especially when th[e] issue involves the actor's state of mind and the only means of ascertaining that mental state is by drawing inferences from conduct," *Huddleston v. United States*, 485 U.S. 681, 685 (1988).  This court reviews the district court's determination that evidence is admissible pursuant to Rule 404(b) for abuse of

discretion, *United States v. Bowie*, 232 F.3d 923, 926–27 (D.C. Cir. 2000), bearing in mind that "Rule 404(b) is a rule of inclusion rather than exclusion," *id.* at 929.

Evidence of Brown's intent, as demonstrated by extrinsic evidence of his knowledge, motive, and the absence of mistake or accident, was relevant to show his specific intent to defraud, *see generally United States v. Breedlove*, 204 F.3d 267, 269 (D.C. Cir. 2000), and his lack of a good faith belief that the "bills of exchange" he tried to deposit at the credit union were legitimate and valuable. As the district court stated in denying Brown's motion for a new trial:

> In order to support a conviction for bank fraud, the Government had to prove beyond a reasonable doubt that Mr. Brown "*knowingly* execut[d], or attempt[ed] to execute, a scheme or artifice — (1) to *defraud* a financial institution; or (2) to obtain any of the moneys, funds, credits, assets, securities, or other property owned by, or under the custody or control of, a financial institution, by means of *false or fraudulent* pretenses, representations, or promises."  18 U.S.C. § 1344 (emphasis added).  Similarly, to support a conviction for fictitious obligation, the Government had to prove Mr. Brown's "intent to defraud," as well as his knowledge that the instruction was fictitious and his intent to represent the instruction as an "actual" security issued under the authority of the United States.  18 U.S.C. § 514.

*Brown*, 535 F. Supp. 2d at 82 (alterations in original).

The Rule 404(b) evidence regarding Brown's recent conduct in using fictitious financial documents to obtain things of value "bears a close relation to the offense charged," *United*

*States v. Moore*, 732 F.2d 983, 989 (D.C. Cir. 1984); *see also United States v. Long*, 328 F.3d 655, 661 (D.C. Cir. 2003). The CarMax and PNC Bank evidence concerned events shortly before the charged offenses. The CarMax evidence was proper Rule 404(b) evidence, as appellant's counsel acknowledged during oral argument, because it showed that before the charged offenses, Brown had been warned by a detective from the Secret Service that it was unlawful to use his "registered" drafts. It also showed Brown had succeeded in obtaining valuable property through use of his fictitious "registered" drafts, which were sufficiently authentic in appearance to fool a lay person. Similarly, the PNC Bank evidence showed Brown had been warned by bank counsel that his "bill of exchange," made payable to the same trust that he later claimed was purchasing the Maryland house, would not be accepted by a financial institution because it was worthless. This evidence was relevant to Brown's intent by reason of his prior knowledge, motive, and absence of mistake or accident in presenting a "bill of exchange" to the credit union for deposit. Such evidence tended to rebut Brown's claim that he acted in good faith in twice attempting to deposit a "bill of exchange" at the credit union. *See United States v. Carboni*, 204 F.3d 39, 44 (2d Cir. 2000); *United States v. Dahlstrom*, 180 F.3d 677, 684–85 (5th Cir. 1999), *cert. denied*, 529 U.S. 1036 (2000). Although the similarity of Rule 404(b) evidence to the pending charges can present special problems associated with a jury's tendency to infer guilt where a defendant has previously done the same thing, *see Old Chief v. United States*, 519 U.S. 172, 185 (1997), the district court gave limiting instructions to the jury to guard against its misuse, *see Mitchell*, 49 F.3d at 777, including after the PNC evidence, leaving the jury free to focus on Brown's intent in view of evidence he knew his fictitious financial documents could fool a lay person but not a bank or Treasury Department official.

No less relevant to Brown's intent, knowledge, motive, and the absence of mistake or accident was the real estate evidence. It showed that even after the credit union had refused to deposit his "bill of exchange" in July 2005 and despite the warning by a Treasury Department agent in August 2005, Brown continued to represent to lay persons that his fictitious financial documents were legitimate and valuable and, when they bounced, to blame others and to protest his good faith. The temporal link between his failed attempt to purchase real property with these documents and his subsequent attempt to deposit a fictitious "bill of exchange" for $ 5.5 million at the credit union suggests his motive in making the second attempt — to cover the real estate purchase.

On the other hand, Brown correctly points out that the evidence about his failure to pay the $700 home inspection fee would not make it more likely than not that he knowingly passed fictitious financial documents at the credit union and was therefore inadmissible under Rule 404(b). *See Linares*, 367 F.3d at 946–47; FED. R. EVID. 401. The government's suggestion that this bad acts evidence establishes Brown's motive "to get money," Appellee's Br. 42, is too far removed from the charged offenses. It had nothing to do with Brown's use of fictitious "bills of exchange" and showed only his bad character in "stiffing" the agent for the fee.

The error in admitting the inspection fee evidence, however, does not require reversal of Brown's conviction. *See Linares*, 367 F.3d at 952. The fee testimony was neither so dramatic nor compelling as to rivet the jury's attention on Brown's bad character; it consumed a small part of the trial (just over three transcript pages); and the government did not mention the fee during closing arguments to the jury. The "district court took caution to guard the space between the permissible and impermissible inferences by instructing the jury

to consider the evidence only for its proper purpose." *Mitchell*, 49 F.3d at 777; *Brown*, 535 F. Supp. 2d at 83. The jury is presumed to have followed this cautionary instruction, *see Shannon v. United States*, 512 U.S. 573, 585 (1994) (citation omitted), and there is nothing to suggest the jury did not do so in Brown's case.

## B.

Rule 403 contemplates that other crimes and bad acts evidence properly admitted as relevant pursuant to Rule 404(b) may nonetheless be inadmissible because its "probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence," FED. R. EVID. 403. "[T]he Rule 403 inquiry in each case involving Rule 404(b) evidence will be case-specific. There can be no 'mechanical solution,' no *per se* rule." *United States v. Crowder*, 141 F.3d 1202, 1210 (D.C. Cir. 1998) (en banc). Because the decision on exclusion rests in the sound discretion of the district court, this court's review is for abuse of discretion. *Henderson v. George Wash. Univ.*, 449 F.3d 127, 133 (D.C. Cir. 2006).

Brown's appeal presents the question of the appropriate considerations for evaluating the district court's exercise of discretion under Rule 403 when the defendant contends he was denied a fair trial because of unfair prejudice and unnecessarily cumulative Rule 404(b) evidence. Although there is "no mechanical solution" for when the admission of 404(b) evidence becomes impermissible under Rule 403, *Old Chief*, 519 U.S. at 184 (quoting FED. R. EVID. 403, Advisory Committee Notes (1972 Proposed Rules)), the Supreme Court has noted that one consideration should be an assessment of the availability of evidentiary alternatives, *id.* at 184-85 (citing FED. R. EVID. 403, Advisory Committee Notes (1972 Proposed

Rules)). Additionally, a court should consider whether the district court issued limiting instructions to guard against improper inferences. *See Mitchell*, 49 F.3d at 777; FED. R. EVID. 403, Advisory Committee Notes (1972 Proposed Rules).

The difficult question raised in Brown's case is when Rule 404(b) evidence is "needless," the last of the countervailing considerations in Rule 403. This court has recognized that generally "it is difficult, if not impossible, to draw a line at which such evidence, by virtue of its sheer volume, necessarily becomes unfairly prejudicial." *Long*, 328 F.3d at 664. Cases in other circuits appear to adopt the approach suggested by Professors Wright and Graham: The district court is not merely to consider the sufficiency of the evidentiary alternatives but rather

> whether the evidence on one side is so full that no jury that rejected it would be likely to change its mind because of the introduction of the proffered evidence. If in order to find against the proponent the jury would have to find that ten eye-witnesses lied, there has to be some special justification for supposing a favorable judgment on the credibility of an eleventh witness to the same facts. * * * This is a rather severe test for the exclusion of cumulative evidence but it is necessary if the judge is to be prevented from using Rule 403 as a device for usurping the function of the jury.

22 CHARLES ALAN WRIGHT & KENNETH W. GRAHAM, JR., FEDERAL PRACTICE AND PROCEDURE § 5220, pp. 306 (1st ed. 1978). *See, e.g.*, *United States v. Rodriguez-Felix*, 450 F.3d 1117, 1129 (10th Cir. 2006) (citing Wright and Graham). In *United States v. Williams*, 81 F.3d 1434, 1443 (7th Cir. 1996), the Seventh Circuit suggested:

Evidence is "cumulative" when it adds very little to the probative force of the other evidence in the case, so that if it were admitted its contribution to the determination of truth would be outweighed by its contribution to the length of the trial, with all the potential for confusion, as well as prejudice to other litigants, who must wait longer for their trial, that a long trial creates.

At Brown's trial, a substantial part of the government's case-in-chief consisted of Rule 404(b) evidence. However, the outcome of Brown's trial turned on the issue of his intent. Brown's conduct in attempting on two occasions to deposit a fictitious "bill of exchange" at the credit union was undisputed. But Brown had claimed each time that he believed the "bill of exchange" was legitimate and valuable, and that he had no intent to defraud the credit union. Extrinsic evidence to show Brown's intent was key to the government's ability to meet its burden of proof that Brown acted with specific intent to defraud. *See Huddleston*, 485 U.S. at 685.

On appeal Brown has not suggested that there were any evidentiary alternatives, *see Old Chief*, 519 U.S. at 185, or that the Rule 404(b) evidence was too remote in time, only that some was not relevant and that the remainder unfairly dominated his trial. Each Rule 404(b) witness, in fact, testified about different occasions when Brown used fictitious financial documents and was warned they were worthless, from which a reasonable jury could infer his intent at the credit union. In this context, the district court could reasonably conclude the properly admitted Rule 404(b) evidence did not implicate needless "piling on" of cumulative evidence, as occurred in *United States v. Weiland*, 420 F.3d 1062, 1078 (9th Cir. 2005), where the government introduced certificates of four nearly identical prior convictions when one sufficed to establish his

felon status. Nor was any of that evidence inflammatory, as in *United States v. Rose*, 104 F.3d 1408, 1414 (1st Cir. 1997), where the government introduced a photograph of the defendant holding a gun, with his finger on the trigger, at the head of another man when other photographs linked the defendant to the gun. The events described by the Rule 404(b) witnesses were normal commercial transactions save for the use of fictitious financial documents.

Contrary to Brown's suggestion, the number of Rule 404(b) witnesses and the number of transcript pages their testimony consumed in the government's case-in-chief is not the only standard by which to determine whether the district court abused its discretion under Rule 403. Rather, consistent with the discretion the rule reposes in the district court, two considerations provide more helpful guidance. First, because of the substantive and temporal connection of the Rule 404(b) evidence to Brown's claim of good faith at the time of the charged offenses, the district court could reasonably conclude that a properly instructed jury would focus on Brown's intent with regard to the charged offenses and not veer off course to focus on his bad character. The CarMax and PNC Bank evidence preceded the charged offenses to show that Brown's fictitious financial documents could fool a lay person and that he had been warned a financial institution would treat his fictitious "bill of exchange" as worthless. The real estate evidence occurred shortly after the first charged offense and the Treasury agent's warning to show why Brown again attempted to deposit a "bill of exchange" at the credit union. These circumstances are in sharp contrast to the circumstances in *United States v. Hays*, 872 F.2d 582, 588 (5th Cir. 1989), for example, in which the testimony of eleven witnesses about the defendant's unscrupulous conduct years prior to the charged conspiracy was "at best" of "fleeting" relevance to the charged offenses.

Second, in view of the government's need to prove Brown's specific intent to defraud by use of extrinsic evidence and the fact that the Rule 404(b) evidence was not merely duplicative, *see supra* Part II.A, the district court could reasonably conclude, because Brown's intent was the only contested issue at trial, that although the Rule 404(b) evidence consumed a large part of the government's case-in-chief, there was no unfair prejudice to Brown or needless presentation of cumulative evidence by the government contrary to Rule 403. Brown did not deny his prior uses of fictitious financial documents, which were fairly recent, only his intent in using them. These circumstances contrast with the circumstances in *United States v. Jones*, 570 F.2d 765, 768–69 (8th Cir. 1978), where the admission of 478 prescriptions, while relevant to establish the nature of the defendant's medical practice and his knowledge of restrictions on prescribing Schedule II drugs, lacked substantial probative force as to the two charged prescription offenses and presented the danger of unfair prejudice, confusion of the issues, and misleading of the jury. The district court might reasonably conclude in Brown's trial, in the absence of compelling prejudice, which the home inspection fee was not, that limiting instructions would serve their intended purpose to guard against the improper use of the Rule 404(b) evidence, *see, e.g., United States v. Douglas*, 482 F.3d 591, 601 (D.C. Cir. 2007); *Mitchell*, 49 F.3d at 777.

Accordingly, we affirm the judgment of conviction.